IRON RIVER GRADE SCHOOL DISTRICT #1 and another, Appellants, v. BAYFIELD COUNTY SCHOOL COMMITTEE, Respondent.

*April 13—May 10, 1966.*

HEFFERNAN, J. This case is another round in the battle for school-district reorganization that commenced in earnest in 1947. The battle that was commenced then has been substantially completed. In 1937 there were 7,777 school districts in the state; by the end of 1965 there were 541. In 1948 over 4,000 school districts were operating one room-one teacher graded schools; there are now less than 100.

This truly herculean reorganization was initiated by the exhaustive report and recommendations of the commission on improvement of the educational system, under the chairmanship of Senator Foster B. Porter, and under the research direction of Mr. M. G. Toepel. The hopes for the future work of the county school committees is best stated in the words of the commission: [1]

---

[1] Report of the Commission on Improvement of the Educational System, November 1948, p. 5.

"The splendid work which has been done by county committees in bringing to the people the need for improved organization to provide better educational opportunities for our children, and the importance of the function in which they are engaged warrant the unqualified recommendation that the county school committees be continued."

The county school committees previously established by the legislature were, as the result of this study, given the green light for comprehensive school-district reorganization. Under the statutory scheme adopted, reorganization was accomplished by county school committees' orders following petition of electors of the county or upon the committee's own motion creating, altering, or consolidating districts within the county [2] subject to referendum and appeal. Substantial reorganization was effected by legislation forcing the attachment of nonoperating districts to operating districts. Municipal boards and councils until 1965 [3] were also empowered to reorganize school districts.[4] In 1959, the legislature ordered that all territory in the state be attached to an operating high school district.

The figures cited above are testimony, statistically at least, to the effectiveness of school reorganization. In 1965 the county committees were abolished and replaced by area-wide agency school committees. That the high hopes that the commission in 1948 had for the county committees were realized is borne out by the following newspaper comment: [5]

"If one were to pick Wisconsin's major accomplishment of the postwar period, it would be this tremendous educational change. It has improved and equalized school opportunities as well as tax burdens. More than that, it stimulated unprecedented citizen interest and

[2] Sec. 40.03 (1), Stats.
[3] Ch. 388, Laws of 1965.
[4] Sec. 40.06, Stats.
[5] Milwaukee Journal, December 5, 1965.

participation in what is, after all, the bedrock of democracy—public education.

"For all this, great credit must go to the county committees, made up not of professional educators but of plain citizens. Despite sometimes bitter and unfair attack, they performed their difficult task with patience, tireless effort and determination. Here, surely, is exemplary citizenship for which the Wisconsin of today and the Wisconsin of tomorrow should be most grateful."

The history of school-district reorganization in Bayfield county parallels the statewide experience. In 1937 there were 53 school districts in the county. At the end of 1964, only 10 school districts remained.

The Iron River school district itself has been embroiled in no less than 10 reorganizations or proposed reorganizations since 1948.[6]

As recently as April of 1965, the county school committee approved a petition and issued an order attaching the Iron River districts to the adjacent Ondossagon (Barksdale) district. This order was nullified by a referendum on May 11, 1965. The order now before the court, attaching 30¼ sections of the district to the South Shore district, went to a referendum and was approved on September 7, 1965. Shortly after the issuance of that order, the school committee ordered that the balance of the Iron River district be attached to the South Shore district. This order was voided by referendum on September 7, 1965.

Appellants contend that the order appealed from leaves the remaining portion of the district financially unable to run its schools. The record shows that the detachment complained of took all but 5¾ sections of the town's territory, depriving it of $1,924,648.05 of its tax base and leaving it with a valuation of $1,339,020.80. However, of the 123 students in the entire district, only

---

[6] Statistics not of record in this case have been obtained by taking judicial notice of public records available in the Department of Public Instruction, Madison.

nine will go to the South Shore district, to which the detached area will be joined. Thus, the portion of the district remaining, with less than ⅙ of the area and little more than ⅓ of the valuation, will be obliged to provide education for about 92 per cent of the students of the original district. It is substantially undisputed that the school district will be unable to finance its modest school budget within the limit of 25 mills allowed by sec. 40.22 (7), Stats. Even optimistically assuming that the district will be eligible for state aids, a deficit of over $20,000 will be incurred. Though it is conceivable that some economies might be effected, a realistic comparison of the anticipated revenues to budgeted expenses can only lead to the conclusion that it will be financially impossible to continue operating the school system.

It is the appellants' contention that the school committee in adopting an order that leads to this result could not have followed the process of "sifting and winnowing," which this court in *Olson v. Rothwell* (1965), 28 Wis. (2d) 233, 239, 137 N. W. (2d) 86, indicated was one criterion of reasonableness.

In determining whether the action of the committee was capricious, it would be well to review the facts of public record that were known to the school committee at the time of this order. That record shows that the Iron River high school, with an enrollment of 41, was the smallest high school in the state. It is, in fact, the only high school in the state with less than 50 pupils. In addition, it is the only high school district in the state that receives *no* state aids whatsoever.

In response to a request for state aids, the state superintendent of public instruction on August 20, 1963, wrote the following to the clerk of the district:

"This will acknowledge receipt of your Self-Evaluation Data Sheets for Basic or Integrated Aids.

"In view of the fact that your district has not been paid state aids for the past several years, we see no

justification in classifying your district to receive aids for the present fiscal year.

"We are concerned for the high school age youth in your area. They deserve a more comprehensive secondary school opportunity than you are offering. The tax burden with which your citizens are saddled is extremely high, especially in the light of the meager educational program offered. We cannot conscientiously ask the State of Wisconsin to share the cost of a program such as you offer. It is our earnest desire that this whole situation might be resolved as quickly as possible so that your children might have the kind of educational program they need and deserve. This department is willing and eager to help if you so desire."

A study at the time of a proposed merger with Ondossagon prepared by the state department of public instruction in April, 1965, showed that the following subjects were taught in the Iron River schools by teachers without legal credentials on file in the office of the department:

"General Math, General Science, Algebra, Mechanical Drawing, Social Problems, Biology, Civics, Boys and Girls Physical Education, French, and U. S. History. In addition, the library is not serviced by a licensed librarian."

The same study showed that annual per-pupil instruction cost in the Iron River high school for 1963–1964 was $928.73, compared to an average cost in nearby Ondossagon of $572.69. This compares to an average state per-high-school-pupil cost of $570. The department estimated that the proposed consolidation would result in an average cost per high school pupil of $593.66 and an average cost per grade school pupil of $508. It was expected that consolidation would drop the tax rate from $28.45 per $1,000 to $18.46. A letter from the department of public instruction dated December 22, 1965, pointed out that the school failed to provide courses necessary to meet the *minimum* standards for

Wisconsin high schools. Nevertheless, the same letter stated that the district was well administered and that there was evidence of good teaching by a number of the teachers.

The grade school was also the smallest of the district, having an enrollment of 85.[7] The total assessed value of the district, slightly in excess of $3,000,000, is only ⅓ of the $9,000,000 assessed valuation now required by sec. 40.12, Stats., as a minimum valuation for a union high school. The minimum student enrollment is required to be 200. The Iron River District was far below these minimum requirements for the creation of a union high school district.

It is apparent, therefore, that the Iron River district was in extreme difficulty prior to the present order, was failing to meet minimum educational standards, and had been unable or unwilling to accept consolidation with another district.

Viewing the action of the committee in this historical context, and on the basis of the evident careful consideration that the committee gave to its decision, after an open hearing with unlimited right to be heard, we cannot conclude that the action of the committee was arbitrary or capricious.

The basic contention of appellants is that the order has, temporarily at least, left the remnant of the district in an inoperable condition.

[7] The following is a comparison of the student population and state aids available to nearby school districts as compiled by the Department of Public Instruction on December 1, 1965:

|  | High School | Elementary | Total | Aid |
|---|---|---|---|---|
| Iron River | 41 | 85 | 126 | No aids |
| Drummond | 73 | 184 | 257 | Pending |
| Port Wing | 139 | 267 | 406 | Integrated |
| Ondossagon | 239 | 450 | 689 | Integrated |
| Maple (Douglas county) | 373 | 795 | 1,168 | Integrated |

However, contrary to the appellants' assertion, the reasonableness of the action cannot be determined from the result alone. As we said in *Olson v. Rothwell, supra,* page 238, "We do not consider the effect of the exercise of power necessarily determines the character of its exercise." The same case recognized that a redistricting that temporarily left four noncontiguous vestiges of a school district in an inoperable condition did not render the action arbitrary or capricious.

We have faced this issue before. In *Zawerschnik v. Joint County School Comm.* (1955), 271 Wis. 416, 73 N. W. (2d) 566, the appellant argued that the order detaching 77.53 percent of the tax base was arbitrary and unreasonable, leaving "a remnant district which will be burdened by excessive taxes and whose financial ruin will result," *supra,* page 424, and "that the tax base . . . is insufficient to maintain a substantial administrative school district," *supra,* page 425. We held in that case, *supra,* page 427, that:

"Whether the boundaries of a school district should be changed is not a question of law or fact for judicial determination, but purely a question of policy, to be determined by the legislative department. . . . They present questions for the consideration of those to whom the state has intrusted its legislative power, and their determination of them is not subject to review or criticism by the courts."

We, in that case, refused to review the decision though the appellants alleged that "ruin will result."

In *State ex rel. Grant School Dist. v. School Board* (1958), 4 Wis. (2d) 499, 91 N. W. (2d) 219, the appellants complained that the annexation took 80 percent of the equalized value of the district, and "denying a proper education to the children in the remaining district," *supra,* page 510. This court there stated:

"These allegations have nothing to do with defects in proceedings taken under the statute but constitute com-

plaints with respect to the *results* of such proceedings and, as such, are not matters of judicial concern." (Emphasis supplied.) *State ex rel. Grant School Dist., supra,* page 511.

The Bayfield school committee was performing its delegated legislative duty. The record amply demonstrates that it was attempting to achieve the basic purpose of the school reorganization law in reorganizing and consolidating school territories in such a way that the educational opportunities of the children involved would be improved. We have said:

"Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the 'winnowing and sifting' process." *Olson v. Rothwell, supra,* page 239.

The committee was confronted with the fact that a substantial number of electors wished to detach from the Iron River district. The alternative to granting the order was to refuse to allow a portion of the citizens of Bayfield county to send their children to a school that offered the promise of something better than the substandard educational opportunities at Iron River. The problem of these people and the inadequacies of the Iron River district were discussed at the public hearing. The educational opportunities afforded at Iron River compared to South Shore were thoroughly discussed. The pros and cons of the proposed order were carefully explored. The "winnowing and sifting" process so venerated in Wisconsin lore was in ample evidence at these proceedings.

While it may be acknowledged that the order casts, temporarily at least, additional and perhaps insuperable burdens upon the remnant of the district; yet, considering the obligation of the committee to its legislative mandate and to the electors of the detached area, it cannot be said that the determination was not at the very least "fairly debatable."

Moreover, it is not unreasonable to conclude that the present situation of the district is but a step toward Iron River's attaining a more satisfactory school-district organization. While Iron River in the past has consistently resisted reorganization, it is not foreclosed from now initiating attachment to an adjacent district.

For example, the Ondossagon attachment for which there was considerable support at the hearing on the present order could be considered immediately upon the filing of a new petition. Other alternative attachments are, of course, available. In the event that it is, in fact, impossible to operate a high school in the remnant district, the agency school committee, under the provisions of sec. 40.035, Stats., can order the attachment of the district, both as to high school and grade school, to a district operating a high school. Such an order is not subject to referendum, but must be appealed to the superintendent of public instruction.

The appellants contend that the order jeopardizes or renders impossible the adequate education of the children of the remnant of the district. It is clear that the Iron River electors can elect other courses of action to reorganize their district. It is at least arguable that such alternative courses that of necessity now face the district might well enhance the educational opportunities for Iron River children.

*By the Court.*—Order affirmed.